IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EUGENE KIST, )
 )
      Plaintiff, )
 ) CIVIL ACTION NO. 3:2006-67
v. )
 ) JUDGE GIBSON
ROBERT FATULA, )
 )
      Defendant. )

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on Robert Fatula's (hereinafter "Chief Fatula" or "Defendant") Motion for Summary Judgment (Document No. 38). In accordance with the analysis herein, the Court will grant the motion for summary judgment.

### I. Concise Statement of Undisputed Material Facts[1]

On May 20, 2004, in his capacity as Police Chief of Jackson Township, Cambria County, Pennsylvania, Chief Fatula responded to a 9-1-1 dispatch call to the scene of a one-vehicle accident on Goldfinch Lane just off Benshoff Hill Road in Jackson Township ("accident" scene) during which time he became involved in an altercation with Plaintiff. Chief Fatula was appointed Chief of Police for Jackson Township Police Department in 1982 after serving as a patrolman for two years.

---

[1] The following facts are based upon Defendant's Concise Statement of Undisputed Material Facts (Document No. 40, 42) and the Plaintiff's Response and Counterstatement thereto (Document Nos. 44, 46). The submissions of the parties were used with any additions to a proposed material fact used or any additional proposed material fact in the record but not offered by the parties indicated in brackets. Any proposed facts not contained within the following recitation of facts were found by the Court to remain disputed in the record or to be immaterial.

On May 20, 2004, when Chief Fatula arrived at the accident scene, he observed paramedics with [the] Jackson Township Volunteer Fire Company No. 1 treating someone who appeared to be a female driver of a four-door Oldsmobile which [had] crashed into a tree stump. Chief Fatula assisted them by removing the toddler strapped into her car seat from the vehicle and delivering the toddler-still in her car seat-into the care of other ambulance personnel who had just arrived on the scene. David Bracken, a volunteer emergency medical technician with [the] Jackson Township Volunteer Fire Company, No. 1 for fifty-one years, was one of the first medics to arrive on scene and, despite knowing Lois Allen - who [] was later determined to be the driver, Mr. Bracken did not [recognize her] due to the severe nature of her injuries.

After Chief Fatula delivered the toddler to the care of the medics, [he] directed his attention to the accident investigation into the cause of the one-vehicle accident. While conducting the accident investigation, Chief Fatula was in the front yard of the property located on Benshoff Hill Road just below Goldfinch Lane examining what appeared to be the path of the vehicle. His back was to Benshoff Hill Road [as] he examined the apparent path the vehicle took from Benshoff Hill Road across Goldfinch Lane to the property on [the] other side of Goldfinch Lane. While Chief Fatula was investigating the accident, Plaintiff [] arrived at the location and began hollering at him. When Chief Fatula heard him yelling at him, Chief Fatula approached Plaintiff, who at that point was approximately 30-40 feet away.

Plaintiff first learned about the accident when Mrs. Scanlan, a resident of Benshoff Hill Road above Goldfinch Lane, called Plaintiff to tell him she heard his long-time girlfriend, Lois Allen, was in an accident down from her house. As Plaintiff was leaving his home to get to the accident scene,

2

Ronald Covalt was at his door, and he also told Plaintiff that Lois Allen was in an accident on Benshoff Hill Road. Plaintiff was worried and upset about Ms. Allen who also had their granddaughter, Grace Edsall in the car with her and was anxious to get to the scene. Plaintiff drove past a fire truck, an ambulance, a person directing traffic, a police car, and Goldfinch Lane before he stopped his car in the middle of a live traffic lane in front of the property [] on Benshoff Hill Road where Chief Fatula was standing approximately 50-60 feet from the roadway.

Lee Fogle, a nearby resident witnessed the accident, ran to the accident scene, and asked the emergency responders if they needed help. Mr. Fogle began directing traffic of Benshoff Hill Road around the emergency fire and rescue vehicles at the intersection with Goldfinch Lane. Mr. Fogle was directing traffic and saw Plaintiff drive past him then stop his vehicle in the middle of Benshoff Hill Road after passing Goldfinch Lane, approximately fifteen (15) feet from where Mr. Fogle was directing traffic. Mr. Fogle [testified that he] saw Plaintiff get out of his red pick-up truck and heard Plaintiff screaming and using foul language at Chief Fatula while he was conducting his accident investigation. [The Plaintiff testified that he yelled at Chief Fatula through the passenger window of his truck that he had rolled down, that he was seated behind the steering wheel at the time, and did not use any foul language toward Chief Fatula.]

When Plaintiff arrived at the accident scene, he attempted to get Chief Fatula's attention but believed the Chief ignored him and was upset because he wanted to get some information but could not get any. Plaintiff became upset when, in his opinion, Chief Fatula stopped him from going down to check on Ms. Allen and his granddaughter. While directing traffic, Mr. Fogle testified that he witnessed a physical altercation between Chief Fatula and Plaintiff during which Plaintiff reached into the driver's

3

side of his pick-up truck, pulled out an object, cocked it over his head then swung it at Chief Fatula. Plaintiff denied that he reached for a hammer and went after the Chief. Plaintiff commonly had tools strewn throughout the passenger compartment of his pick-up truck and did have a hammer with a wooden handle similar to the one Chief Fatula presented at Plaintiff's Preliminary Hearing on the criminal charges Chief Fatula filed against Plaintiff as a result of the altercation at the accident scene. As of May 20, 2004, Mr. Fogle knew Mr. Kist's name and would occasionally see him drive past Mr. Fogle's home, but did not know him personally.

Edward Bernat, a resident of 218 Moshannon Drive, came upon the accident scene and while sitting in traffic he witnessed Chief Fatula unholster his weapon and point it at Plaintiff, and re-holster it while Plaintiff was in his red pick-up truck. Prior to this incident, Mr. Bernat only knew Chief Fatula was a police officer, but had no interaction with him; he did not know Plaintiff. [Ron Covalt, who followed Plaintiff to the scene, witnessed Fatula approach the driver's side of Plaintiff's vehicle. Covalt saw that something was amiss and started to walk toward Plaintiff's truck. He also observed Defendant threatening to mace Plaintiff and Plaintiff asking the Defendant why he was doing this to him. Covalt observed that Defendant had his arm inside Plaintiff's truck window at one point. He then observed Defendant mace Plaintiff, take him out of the truck, put him on the ground, and handcuff him. Covalt testified that Plaintiff repeatedly asked Defendant why he was doing this to him and then Defendant told Plaintiff "you don't even know why the F you're here."] (Deposition of Covalt, Document No.48 , Exhibit 2 , p. 35).

Immediately after Chief Fatula handcuffed Plaintiff, he was compliant and Chief Fatula requested paramedics to treat Plaintiff with water rinse for his eyes. While paramedics David Bracken

4

and Timothy Burkey treated Plaintiff after he was sprayed with pepper spray and handcuffed they testified [that] Plaintiff's face was red, but saw no bruising to Plaintiff's face and Plaintiff did not complain of any bruising to any part of his body, and requested no medical treatment while they flushed his eyes with water.

Prior to May 20, 2004, Chief Fatula and Plaintiff had only interacted in a professional capacity which primarily occurred when Chief Fatula investigated several claims made by Plaintiff regarding burglaries and/or thefts from his properties; Chief Fatula's investigation ultimately concluded Plaintiff's claims were unfounded. Chief Fatula also interacted with Plaintiff on an unknown election day prior to this incident where Plaintiff, in a loud and boisterous manner, directed Chief Fatula to remove signs that he believed were placed in violation of election laws. Chief Fatula advised Plaintiff to direct his complaint to the constable with jurisdiction at that polling place. Plaintiff [interacted] with Chief Fatula when Plaintiff hit another car and was issued a citation by another office[r] to which he pled not guilty and requested a hearing. When Chief Fatula appeared for the hearing, Plaintiff objected to his testimony but the Court overruled Plaintiff's objection and ultimately Plaintiff was found guilty on the citation.

As a result of [the occurrences of May 20, 2004], Chief Fatula filed a criminal complaint against Plaintiff charging him with aggravated assault, simple assault, recklessly endangering another person, terroristic threats, and resisting arrest. On May 12, 2005, Plaintiff entered a plea of *nolo contendere* to the reduced charge of disorderly conduct, misdemeanor in the third degree.

After Plaintiff was arrested for his conduct on May 20, 2004, he filed complaints against Chief Fatula with the Federal Bureau of Investigation, the Pennsylvania Attorney General, the Cambria County District Attorney, and the Jackson Township Board of Supervisors. Chief Fatula was cleared

5

of any wrong-doing alleged by Plaintiff in his complaints to those agencies. On March 17, 2006, Plaintiff filed this suit against Chief Fatula and two other defendants, David Bracken, former Township Supervisor for Jackson Township and "John Doe" (collectively, "Defendants"). After Defendants filed a Motion to Dismiss the Complaint, Plaintiff filed an Amended Complaint on August 29, 2006. Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint, which this Court granted in part and dismissed with prejudice five of the six counts. The only remaining count of Plaintiff's Amended Complaint was Count I. The Court also dismissed David Bracken and John Doe as Defendants.

The sole remaining count of the Amended Complaint is Plaintiff's allegation that Chief Fatula used unnecessary and unwarranted force against Plaintiff at the accident scene which caused him to suffer emotional distress. Plaintiff believes his primary care physician referred him to psychiatric treatment for approximately one year because he was treated "rudely" at the accident scene; Plaintiff further believes he stopped going because of the costs involved. Plaintiff testified at his deposition that he had no independent recollection of his treatment for emotional distress and relied exclusively on the content of his medical records. Plaintiff's medical records of his sessions with Nulton Diagnostic Center, P.C. confirm Plaintiff was referred by his primary care physician for an evaluation and treatment of depression resulting from the murder of Plaintiff's brother in the first week of May and his "wife's" motor vehicle accident. The only reference in these records regarding the incident with Chief Fatula was a notation that Plaintiff had an upcoming hearing but that the charges were "vague."

Plaintiff was diagnosed with moderate, single-episode depression resulting from the murder of his brother and the hospitalization of his wife and was further diagnosed with early stages of Dementia/Alzheimer's. The medical records establish that Plaintiff appeared for only four visits and

6

was discharged because he was not attending sessions. In sworn testimony, Plaintiff failed to recall a physical at the VA Hospital on July 27, 2004, two months after the incident with Chief Fatula, during which Plaintiff was asked whether he had experienced any upsetting events to which he responded no. During the same physical, Plaintiff did not complain of any emotional distress. Plaintiff does not recall whether he told his primary care physician that he had pain and suffering, emotional distress, or embarrassment as a result of the incident with Chief Fatula.

## II. Analysis

### A. Summary Judgment Standards

The following standards are applied in ruling upon a motion for summary judgment:

> Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552- 57, 91 L.Ed.2d 265 (1986) ; Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638].

*Troy Chemical Corp., v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

Federal Rule of Civil Procedure 56 (c) states in pertinent part that judgment should be granted "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is

7

> independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes*, 398 U.S., at 158-159, 90 S.Ct., at 1608-1609. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.Rule Civ.Proc. 56(e) (emphasis added). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)(internal citations omitted)(footnote omitted).

### B.    Discussion

In Count I of the Amended Complaint, Plaintiff alleges that the Defendant used excessive force in violation of the Fourth Amendment. Consequently, the Defendant argues that summary judgment is appropriate under 42 U.S.C. §1983 for three reasons: 1) Plaintiff cannot produce any competent

8

evidence that excessive force was used against him; 2) Defendant is entitled to qualified immunity; and 3) Plaintiff is not entitled to punitive damages. The Court will address each of Defendant's arguments below.

### Excessive Force and Qualified Immunity

"[C]laims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard..." *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)(quoting *Graham v. Conner*, 490 U.S. 386, 388 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 490; *Kopec v. Tate*, 361 F.3d 772, 777 (3d. Cir. 2004); *Mosley v. Wilson*, 102 F.3d 85, 95 (3d Cir. 1996). A Court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

The reasonableness of the officer's use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The Court may be guided by several other factors, including: 1) the duration of the officer's action; 2) whether the action takes place in the context of effecting an arrest; 3) the possibility that the suspect may be armed; 4) the number of persons with whom the police officers must contend at one time; and 5) whether the force applied was of such an extent so as to lead to injury. *See Graham*, 490 U.S. at 396. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d

9

Cir. 1997); *Cowden v. Duffy*, 446 F.3d 483, 496-97 (3d Cir. 2006). Whether the force was reasonable is a question of fact. *See Graham*, 490 U.S. at 396.

The Defendant argues that even if his actions did not comply with the Fourth Amendment, they are shielded from suit by reason of qualified immunity. A two part test is used to determine whether the official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 200-202 (2001). The factors of this test may be approached in any order, and if one factor is lacking then qualified immunity has been established and the other factor need not be pursued.[2] For the first factor, the Court must determine whether the official's conduct violated a constitutional right. *Id.* at 201. For the second factor, the Court must determine whether the constitutional right was clearly established at the time of the official's actions. *Id.* The inquiry requires that, "the contours of the right...be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (internal citation omitted). "That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?" *Bennet v. Murphy*, 274 F. 3d 133, 136 (3d Cir. 2002). As such, the doctrine of qualified immunity protects the officer from liability if "the officer's mistake as to what the law requires is reasonable." *Saucier*, 533 U.S. at 205.

The Court concludes that the facts relevant to the first factor establish that the Defendant did not violate any rights of the Plaintiff.

---

[2] On January 21, 2009, the Supreme Court of the United States held that "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, [district and circuit judges] are in the best position to determine the order of decision-making that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, ___U.S.___, 2009 WL 128768,* 13 (2009).

Defendant argues that Plaintiff offers conclusory allegations in support of his claim that the Defendant used unnecessary force during the incident occurring on May 20, 2004 and lacks evidence that he suffered any injury from the incident. Plaintiff claims that he arrived at the accident scene and was yelling to Chief Fatula to ask where his granddaughter and long-time girlfriend were located. Plaintiff does not contest the fact that Chief Fatula did not hear what he was initially yelling and that the Chief was unaware of who was involved in the accident and that Plaintiff had any ties to the accident victims. Plaintiff also does not contest the fact that he stopped his vehicle in a live traffic lane directly adjacent to the accident. Plaintiff further admits that he had tools strewn about the cabin of his truck. However, Plaintiff claims that he never exited his vehicle, never threatened Chief Fatula with a hammer, and never used foul language towards Chief Fatula. Plaintiff asserts that the Chief Fatula punched him in the face, aimed his firearm at him, sprayed him with mace, and forcibly removed him from his vehicle and put him in handcuffs.

Plaintiff did enter a plea of *nolo contendere* to the reduced charge of disorderly conduct, misdemeanor in the third degree. The Court, in its Order of August 17, 2007, permitted Count I to stand irrespective of this fact because the Court found that a claim for excessive force under §1983 would not impugn the criminal conviction for resisting arrest if a court could find "that the degree of force employed by Fatula in effectuating the arrest was unreasonable under the circumstances and still determine that Kist's own conduct met the requisite elements for disorderly conduct." (Document No. 23, p. 9). 18 Pa. C.S.A. § 5503 pertaining to Disorderly Conduct states:

> **§ 5503. Disorderly conduct**
> 1. **(a) Offense defined.**--A person is guilty of disorderly conduct if,

11

> with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> (1) engages in fighting or threatening, or in violent or tumultuous behavior;
>
> (2) makes unreasonable noise;
>
> (3) uses obscene language, or makes an obscene gesture; or
>
> (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.
>
> **(b) Grading.**--An offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a summary offense.

Since Plaintiff was blocking a live traffic lane at a serious accident scene and yelling at a police officer, the underlying disorderly conduct claim met the requisite elements of the underlying offense. It must be noted that since it was a misdemeanor in the third degree, the Plaintiff must also have had "the intent...to cause substantial harm or serious inconvenience" or "persist[ed] in disorderly conduct after reasonable warning or request to desist." Plaintiff's admission to this intent or persistence in this conduct is further evidence putting Chief Fatula's behavior in context. However, despite the legality of the Plaintiff's arrest and the fact that his plea provides evidence of Plaintiff's behavior, it is still possible that Chief Fatula used unreasonable force in arresting Plaintiff.

In support of his assertions, Plaintiff relies on the deposition testimony of Ronald Covalt, who was also present at the accident scene. Covalt testified that while sitting in his truck he observed that "there was obviously something going on and I got out of my truck and walked to his truck." (Deposition of Covalt, Document No.48 , Exhibit 2 , p. 29). When asked where Chief Fatula was

12

located, Covalt stated, " I can remember seeing him at Mr. Kist's driver's side window." (*Id.* at 38). He stated that Fatula " was yelling at him and was at the door like he was keeping him in there, you know." (*Id.* at 40). When asked whose mannerisms indicated to him that something was not right, Covalt said "Chief Fatula's". (*Id.* at 41). Before exiting his vehicle, Covalt testified that he thought Fatula "had his arm in Mr. Kist's window... And you know, that's when I thought, well, I don't know what's happening but I better." (*Id.* at 42).

Covalt described the incident as he observed it, as follows:

> It was obvious just — I mean, just from observing that there was some kind of scuffle going on. That's why I walked down there. And when I got there, Mr. Fatula (*sic*) telling him if he didn't settle down he was going to mace him and so on and so forth. And Mr. Kist was in there this (*sic*) saying why are you doing this to me, and Mr. Fatula did mace him, and took him out of the truck and took him to the rear of the truck, put him on the ground and attempted to handcuff him. And couldn't get the cuff's on the back, so he put them on his hands this way. And then Mr. Kist kept asking him, you know, Bob, why are you doing this to me? And he said, I come to this accident —. And Officer Fatula said you don't even know why the F you're here and so on and so forth. (Id. at 39).

Plaintiff argues that Covalt's testimony supports his version of events and is enough to create a material issue of fact with regard to the reasonableness of Chief Fatula's behavior. Covalt did not observe Plaintiff threaten Chief Fatula with a hammer, although Plaintiff admits that there were tools strewn about the cabin of his truck. Plaintiff admits that he parked in a live traffic lane near ambulances and fire trucks needing ingress and egress while other traffic was attempting to pass through. Plaintiff also admitted that he was yelling at Chief Fatula. Covalt witnessed a "scuffle" and Chief Fatula telling the Plaintiff to "settle down." Additionally, Edward Bernat saw Chief Fatula remove his firearm aim

13

it at Plaintiff and then reholster it. Finally, Covalt saw Fatula with his arm in Plaintiff's truck, saw him mace Plaintiff, and saw him remove Plaintiff from the truck and handcuff him.

Conversely, Defendant argues that Plaintiff's injuries or lack thereof should be considered as a factor in the excessive force claim. Defendant claims that Plaintiff cannot prove that he suffered any significant injury as a result of his altercation with Defendant. Plaintiff has not, in fact, presented any medical documentation with regard to physical injuries suffered from the incident. Plaintiff was treated at the scene with water rinse by a paramedic and the paramedic noted that Plaintiff's face was red. However, Plaintiff did not seek any further treatment for any physical injuries stemming from the incident and none were noted. Plaintiff also claims that he suffered emotional problems due to his treatment at the accident scene. He claims that he was referred to a psychiatrist by his primary care physician due to being treated "rudely" at the accident scene. Plaintiff's records confirm that he was referred to a psychiatrist due to the murder of his brother in the first week of May 2004 and his "wife's" accident. One reference to Plaintiff's arrest appears in the medical records referencing that Plaintiff had a hearing coming up and that the charges were "vague." Plaintiff was diagnosed with moderate, single-episode depression resulting from the murder of his brother and the hospitalization of his wife and was further diagnosed with early stages of Dementia/Alzheimer's. Plaintiff was discharged after four visits because he stopped attending sessions.

Defendant relies on three cases in support of his arguments, *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *Donahue v. Beers*, 2006 WL 2788221 at * 2 (W.D. Pa. 2006), and *Moore v. Vangelo*, 2005 WL 2178885, No. 03-4718, at * 5 (E.D. Pa. 2005). The Court notes that two of these opinions are unpublished and thus discusses the Third Circuit case of *Sharrar v. Felsing*. In *Sharrar*,

14

a twenty member SWAT team was dispatched to find and arrest the plaintiff and three accomplices that were accused of pistol whipping the plaintiff's estranged wife. *Sharrar*, 128 F.3d at 815. Once the neighborhood was evacuated around the house containing the four men, they were ordered out of the house walking backwards with their hands on their heads. *Id.* at 816. Upon exiting the residence, the men were ordered to lay face down in the dirt while officers pointed automatic weapons at them and screamed at them that they were going to blow their heads off. The plaintiff was then handcuffed while an officer held him down with his knee. *Id.* The appellate court upheld the trial court's grant of summary judgment to defendants as to the plaintiff's claim of excessive force, holding:

> It does not follow, however, that the extreme methods used in effecting the arrest, such as requiring plaintiffs to lie face down in the dirt, with guns to their heads and vulgar threats, were constitutionally excessive, even though they caused plaintiffs' discomfort and humiliation.

*Id.* at 821.

Drawing all inferences in Plaintiff's favor and viewing the situation as a "reasonable officer" would, the Court finds that Chief Fatula is entitled to qualified immunity. If at the very least, Chief Fatula witnessed Plaintiff stop in a live traffic lane, block traffic, begin and continue yelling, and then either behave with "the intent...to cause substantial harm or serious inconvenience" or "persist in disorderly conduct after reasonable warning or request to desist"[3] then a reasonable officer would find a need remove Plaintiff as a danger to others. Even when taken as true the fact that Chief Fatula aimed his firearm at Plaintiff, reached into Plaintiff's vehicle, threatened to mace Plaintiff, and then maced him, it does not follow that these actions, while perhaps unnecessary in hindsight, were perpetrated by

---

[3]As was noted above, Plaintiff pled guilty to this behavior.

15

Chief Fatula to purposefully violate the Plaintiff's rights. Plaintiff was not physically injured during the arrest process. He briefly endured pain from the mace which was quickly treated once he became cooperative. Further, while Plaintiff claims embarrassment and humiliation stemming from the event and attended psychological counseling for his wife's accident and his brother's murder, his arrest was only mentioned once in the medical record and was not mentioned as a cause of Plaintiff's mental duress. Chief Fatula was not required to use the least restrictive means to effectuate the arrest when there was a risk in safety to himself and others. Thus, qualified immunity applies to Chief Fatula's actions.

### III. Conclusion

The Court notes that since Defendant is entitled to qualified immunity, Plaintiff's claim for punitive damages must also be dismissed. For the reasons stated herein, the Motion for Summary Judgment filed by Defendant is granted.

An appropriate Order follows.

**AND NOW**, this 27th day of February 2009, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion for Summary Judgment (Document No. 38) is GRANTED in its entirety.

BY THE COURT:

*/s/ Kim R. Gibson*

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**